## Case No. 17,639.

### WILCOCKS v. PHILLIPS.

[1 Wall. Jr. 47.] [1]

Circuit Court, E. D. Pennsylvania. Oct. 21, 1843.

PAROL PROOF OF CHINESE LAWS — WITNESSES — COMPETENCY OF PAID LEGATEE — SHIPPING — RIGHTS OF MASTER AND OWNERS — MASTER'S COMPENSATION—USAGE.

1. While in the case of an isolated and peculiar nation, like China, there may be admitted parol evidence of its laws, and this from persons not juris consults, yet such evidence will be received only where it is so direct and positive as to be quite free from ambiguity.

2. A paid legatee is a competent witness where payment has been made by the executor, voluntarily, with knowledge of the claim sued upon, and without a refunding bond, and a long time has elapsed since the death of the testator. The length of time is regulated by analogy to the statute of limitations.

3. The relative rights of ship-owner and captain stated: and the captain and ship having been employed in an Eastern country in a service not strictly within their ordinary offices, and not originally, in any way contemplated, the captain was regarded as not being a mere agent of the ship-owner: and was accordingly allowed to receive compensation on his account, from the parties with whom he dealt: the compensation, though large, appearing to be somewhat in the nature of a present.

4. The doctrine of usage and agency stated: and considerable efficacy given to usage in a particular trade. Similar effect given to a settlement of accounts made by a party's general agent abroad and acquiesced in by the principal here for four years; and particularly where a party was dead.

[Cited in brief in Barnard v. Kellogg, 10 Wall. (77 U. S.) 386.]

Mr. Wilcocks, the plaintiff, was the sole owner of the ship Scattergood, of which Phil-

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

[1] [Reported by John William Wallace, Esq.]

lips, the defendants' testator, in his lifetime, was captain. In the early part of 1829, the ship was sent out by the plaintiff from Philadelphia to Canton. under a charter-party. Phillips was to receive the regular wages of a master, and to have the privilege of certain tonnage.[2] One Latimer was at this time the plaintiff's general agent in China, clothed with very extensive and discretionary power, and the ship and captain were put under his orders, and directed to be governed entirely by him. The ship Levant, belonging to Perkins of Boston, and lying at Lintin (near Canton) as an opium store-ship, became disabled soon after the Scattergood arrived there; and by an arrangement between Mr. Latimer and the agent of Perkins. the Scattergood took the place of the Levant; and continued to be employed for twenty-two months as an opium store-ship. The business of this sort of ship, otherwise called a receiving ship or go-down, is to receive opium from the regular transporting ships, keep it in store, and deliver it out when sold to the Chinese. There is paid for the storage of opium in such ships, a regular charge of two dollars a month, per box, and, besides this, upon the delivery of the opium to a purchaser or smuggler. is paid a kumshaw of five dollars for each box. The number of boxes of opium stored in this ship was about five thousand. The kumshaws were received, in part, by Captain Phillips, aboard. and. in part. by Mr. Latimer. ashore. and paid over by him to Captain Phillips; but no express agreement was made respecting the right to them. To recover these kumshaws (which the plaintiff claimed as part of the ship's earnings) was the object of the present action of assumpsit.

First point of evidence: In the course of the trial, the deposition of an individual who was captain of a large ship trading to China, was read by the plaintiff. In his cross-examination by the defendant's counsel, in answer to a question as to what was the cause of the kumshaw's being greater on opium than that on salt-petre. this person said. that he supposed it was because of the greater value of opium; "for," said he, "salt-petre is prohibited by law. so far as I know. as well as opium." As it was possible that the illegality of the opium trade would become an important point for the defendant, the plaintiff's counsel objected to the reading of this answer, because it tended to no purpose but to shew the illegality of the trade in opium; and. as shewing this. that it was incompetent.

The point was argued. on both sides. at some length. For the plaintiff. it was said: 1st. This is matter of law. The witness. himself. says: "prohibited by law." From the nature of the case. the presumption is. that it was a written law. In Robinson v. Clifford [Case No. 11,948]. where the deposition

² By this is meant. a right to carry a certain amount free of freight, or to receive a certain part of the freight.

of a captain, stating that, according to the law of St. Christopher's, no other vessel could have been permitted to bring away the cargo, was offered, Judge Washington said, that "the statute or written law of foreign countries, should be proved by the law itself, as written. The common, customary, or unwritten law, may be proved by witnesses acquainted with the law. In this case it does not appear whether the law alluded to by the witness was written or unwritten. From the very nature of it, I presume it to be the former." In Seton v. Delaware Ins. Co. [Id. 12,-675]. where a witness was offered to prove that the exportation of specie from Cuba was prohibited. the court rejected the evidence, and said. that as this was a subject of purely municipal arrangement, "the law must be presumed to be written, and therefore it should be produced; or evidence given to prove that it was not in the party's power to obtain a certified copy of it: in which case inferiour evidence might be received." These cases are in point; and the presumption must be that the law was written. The defendant has not shewn that evidence of this law could not have been obtained. In fact, the law could have been procured. From what has taken place in the last three or four years, we know that there are laws in China respecting the trade in opium: they have been published; and it is as possible to ascertain the custom-house laws of China as those of Cuba. But, 2nd: The statement of the witness is not direct and positive, nor in answer to a direct question. Being asked why the kumshaw on opium was greater than that on salt-petre, he answers that question, and adds, that so far as he knew, both trades were equally illegal. So vague a statement, from the captain of a ship, upon a point of law demanding nice discrimination and the utmost certainty, is good for nothing.

For the defendant, it was said: The principle settled in the cases is. that if the law of a foreign country is shewn to be in writing. or cannot but be so presumed. the written law must be produced. But all the cases that have hitherto occurred. and have been referred to, were of civilized nations known to have laws. and laws which may be procured. But here is a country unlike every other on the face of the earth. If it may be called civilized. its civilization is entirely its own. Secrecy marks every thing relating to its concerns. and. especially. every thing relating to its court. You cannot know of what nature is the law; whether it is common law, statute. or something differing from both. The rules and presumptions of evidence must have regard to the state and institutions of the particular country, and the actual state of knowledge respecting it; of which the court will take notice. In the Cherokee Case, 5 Pet. [30 U. S.] 1. the supreme court of the United States took notice of the peculiar, sui generis character of the Indian tribes; and. in like manner. the court. in this case, will

regard the isolation and other peculiarities of China. In respect to the laws of such a nation the court cannot know judicially what is the medium of proof; or, if it will take judicial notice of what it is, will also take notice, as an inseparable part of the same subject, of the impossibility of obtaining that proof. In Cowqua v. Lauderbrun [Case No. 3,299], Judge Washington admitted parol evidence of the customary interest, in China, of 12 per cent. But besides the peculiarity of the nation concerned in the present case, it is no universal principle that the commercial law of foreign countries is presumed to be written. In Livingston v. Maryland Ins. Co., 6 Cranch [10 U. S.] 274, parol evidence of the laws of Spain in relation to the trade of Peru, having been rejected by the judge below, the supreme court held the rejection to be errour. "It is the opinion of the court," said Chief Justice Marshall, "that as the laws and regulations by which this trade was regulated, are not proved to have been in writing, as publick edicts, but may have depended on instructions to the governour, they may be proved by parol." Page 280. This case was acted upon by the supreme court of Pennsylvania in Dougherty v. Snyder, 15 Serg. & R. 84; and the court there said that as foreign laws were usually difficult of proof, and proof by authenticated copies would be very expensive, it shall "reasonably fall on the party objecting to the parol proof, to shew that the law was a written edict of the country. Reason and publick convenience, the just administration of the law, require this. . . . There can be no difference whether it be a law regulating trade or a law on any other subject: the rule, from its nature, is universal." Page 87. If, then, parol evidence be admissible we have enough. The witness was captain of an East Indiaman; a person to whom vast interests are intrusted. Such an officer must be presumed to be a person of intelligence. He must, himself, be acquainted with the laws of the port to which he trades. He has a high interest to know them; and when he states, as a matter of fact, that no trade could be had in opium, the presumption must be that it is so. We can, in regard to China, have no evidence from jurisconsults. The witness, under any exposition of his testimony, speaks to the whole extent of his knowledge: it is unlawful so far as he knows; and being a person who must know. the expression is tantamount to an affirmation of illegality. But the answer shews that the expression, "so far as I know," refers to the trade in salt-petre, to which the inquiry was directed. "The trade in salt-petre is unlawful so far as I know,—as well as that in opium." The trade in opium, he assumes to be so; and knows to be so: the trade in salt-petre is equally unlawful, so far as he knows. Perfect knowledge in regard to opium is clearly avowed by the answer, whatever may be the character of his knowledge with regard to the salt-petre.

BALDWIN, Circuit Justice. If the witness had stated, positively, what the law was, the court would have been inclined to admit the evidence; for it is true that, to a certain extent, the rules upon this subject must subserve the practical necessities of mankind. China is a country with which, as yet, we have had no treaties nor any diplomatick intercourse; and nearly all that we know of its government, laws and institutions, is derived from the relations of merchants, missionaries, and other persons who have been there. It would be too much, in the late or even in the present condition of that country,[3] to require a party to produce certified copies of its statutes. The nation, it is well known, is isolated and peculiar; and we know of no way in which access could be had to its records. These are facts which, in a case so notorious, the court will judicially notice. Had the statement of the witness, therefore, been direct, responsive and full, we should have received his testimony, as an exception to a rule of law whose obligation, in most cases. is admitted. But it would be as an exception; and coming in on that ground, the testimony should be marked by nothing unprecise or imperfect. The witness in this case, however. does not state, either directly or by clear inference. that to his knowledge the trade in opium is illegal. His answer is ambiguous, and an adjection

[3] Allusion is here made to well known events of the day. In March 1839, the celestial court issued an edict by which, after reciting that notwithstanding the prohibitions formerly enacted against the importation of opium. the drug was still smuggled by thousands of boxes into the various ports of China, it declares that the wrath of the great emperour had become "fearfully aroused," and would not rest until the evil was "utterly extirpated." Extreme penalties were then declared against every man who attempted to get it into the empire: And the final result was, that the Chinese government seized and destroyed all the opium on which it could lay hand, and put the British residents and officers of trade into prison War having been declared against China by Great Britain. the Chinese were entirely conquered; and a treaty of peace was concluded in August, 1842, between the Chinese and Great Britain. by which the former agreed to open five of their principal ports to British commerce; to allow consuls to reside in them; to conduct all correspondence between the two nations on terms of perfect equality. and to cede the island of Hong-Kong in perpetuity to the British nation. These events were generally regarded as likely to work a revolution in the intercourse of other nations with China; and the subject having been recommended to the attention of congress, "An act providing the means of future intercourse between the United States and the government of China." was passed. March 3rd. 1843 [5 Stat. 624]. by which. means were placed at the disposal of the president of the United States. to enable him to establish the future commercial relations between this country and the Chinese empire, on terms of national equal reciprocity. In pursuance of the power given by this act, President Tyler, shortly after its passage, appointed Mr. Caleb Cushing minister to China: and that gentleman departed on his new embassy in August of the same year: but when this case was tried. intelligence had not been received of his arrival in China.

to an answer rather than any answer itself; and withal, is but vague. Such evidence will not do; and on this ground alone, we order the answer to be stricken from the deposition.

Second point of evidence: In the further progress of the trial, a person who was the legatee of a watch under Captain Phillips' will, was called by the defendants as a witness. The legacy had been paid in August, 1836; and this suit was brought to October, 1835. It appeared by the accounts of the executors, that Phillips' estate was insufficient to pay the claim in this suit, should it be recovered; and the plaintiff therefore objected to the competency of the witness, on the ground of interest.

Against the admission it was said:—The witness is interested to defeat this action; for in the event of a recovery, he may at once be compelled to refund the legacy. First: The executors may compel him to refund by bill in equity. In Nelthrop v. Hill, 1 Cas. Ch. 135, it is said, that "if the executors pay out the assets in legacies, and, afterwards, debts appear * * * of which they had no notice before the legacies paid, that the executors, by a bill here, might force the legatees to refund." Page 136. On this point the counsel cited, likewise, Burnley v. Lambert, 1 Wash. [Va.] 308; Bower v. Glendening, 4 Munf. 219, 221; Gallego v. Attorney General, 3 Leigh, 450. And as the executors have no right to recover till this or some other claim large enough to exhaust the whole estate is judicially proved to exist, the statute of limitation has not yet begun to run. An executor is not bound to notice every idle claim. He must be satisfied, in his own mind, or by a judgment, or decree, of the existence of the debt. Second: The creditors likewise, after establishing the debt at law, may, by bill in equity, compel the legatee to refund. Burnley v. Lambert, already cited; Milligan v. Milledge, 3 Cranch [7 U. S.] 220, 228; Dunn v. Amey, 1 Leigh, 465, 472; Anon., 1 Vern. 162; Newman v. Barton, 2 Vern. 205; Gillespie v. Alexander, 3 Russ. 130, 136. In Clarke v. Gannon, Ryan & M. 31, a paid legatee was admitted only because, under the circumstances, it could not be inferred that the estate was insufficient.

It was said contra:—This was a voluntary payment, with notice of an outstanding claim; for the bringing of a suit is notice. The case of Nelthrop v. Hill, cited from the "Cases in Chancery," and on which all the subsequent decisions and dicta are grounded, is therefore, rather an authority for us than otherwise. Notice having been given, that case, by its very terms, excludes the case now before the court. In addition, from the absence of a court of chancery, there is no method, in Pennsylvania, by which the creditor could pursue the legatee. But if either creditors or executors could have ever had a right to bring back the legacy, the right has been barred by lapse of time. By

29FED.CAS.—76

analogy to the acts of limitation the time elapsed here is more than sufficient to bar an action, at common law, by the executor, and more than sufficient to discharge lands from liability to creditors. If the claim upon the legatee is barred by lapse of time, then, on the authority of Ludlow v. Union Ins. Co., 2 Serg. & R. 119, 132, he is competent.

BALDWIN, Circuit Justice. The present suit was pending when the legacy was paid: the claim was therefore fully known; and as there was no refunding bond taken, nor promise required, nor condition made, it is a voluntary payment, and the executor cannot recover it back. We question whether, under the law of Pennsylvania, a recovery could be had by a creditor against the legatee: the claim would be against the executor. But if there were a legal method of recovery, it must be considered that the lapse of time, (now seven years,) has created a bar. Lands of a decedent, which, in Pennsylvania, are chattels for the payment of debts, would be discharged from the lien in favour of creditors; and chattels, after so long a time cannot be considered as liable even in equity. This case we can hardly regard as within the principle of those cases of fraud, where the limitation begins only from the time that the fraud is discovered. The institution of a suit was clear notice not to pay. Let the witness be admitted.

The questions of evidence having been settled, the defence to the main question rested, chiefly, on two points. First: That by the usage of the opium-trade the kumshaws belonged to the captain. Second: That an account had been settled with Captain Phillips by the plaintiff's agent, Mr. Latimer, in 1831, in which the kumshaws were treated as belonging to Phillips, and that this account had not been objected to by the plaintiff until shortly before the bringing of this suit, which was brought in 1835.

In respect to the usage, many witnesses were examined. It appeared that in the East a present is always made on concluding any considerable business, and that on the general Canton trade, the kumshaw is a present made by the hong merchant or broker to the captain or supercargo, upon the completing of a sale. It is voluntary on the part of the hong. It consists, not of money, but of shawls, fine teas, &c. and is always regarded as the perquisite and private profit of the person to whom it is made. But the kumshaw in the opium-trade differs in some respects from that in the ordinary Chinese trade. It is a money-fee, fixed in amount, and obligatory upon the purchaser. In this trade, no hong merchant is employed; but the dealing is direct between the captain and the smuggler. It appeared, likewise, that there was a liability to arrest and punishment by the Chinese government of persons engaged in smuggling opium; though, practically, the danger, at the time of these

transactions, was not very considerable. With regard to the different opium ships at Canton, it seemed that as between the owner and the captains, the right to the kumshaws was usually, though not always, matter of special agreement; and that in the British ships it was generally divided. In the Levant, which was the only American ship which had been engaged in the opium store-trade, the captain received the whole kumshaw. The kumshaw is paid only when the opium is delivered to a purchaser or smuggler, and not when it is trans-shipped.

As to the plaintiff's relinquishment of his right, and Mr. Latimer's having given the kumshaws to Captain Phillips, it appeared that Mr. Latimer (who, as has been already stated, was the plaintiff's general agent, and clothed with large discretionary powers) settled an account with Phillips in 1831, in which the kumshaws were carried to the credit of Phillips; and no objection nor dissent was expressed by the plaintiff until shortly before this suit was brought. There was also some other (not very clear) evidence to shew a rather more direct recognition by the plaintiff of this settlement. On the other hand, Mr. Latimer stated that he did not consider the kumshaws as falling within his province.

Mr. Gilpin and Mr. C. Ingersoll, for plaintiff.

Mr. Meredith and Mr. Cadwalader for defendant.

BALDWIN, Circuit Justice (charging jury). The relations between the parties, originally, were these: Phillips, as captain, was, by law, the plaintiff's agent in navigating the ship and delivering the cargo. The captain's compensation consisted of his wages and a privilege or right of tonnage, which had been allowed to him, and he was not entitled to any of the earnings of the ship or profits of the voyage. Subsequently, however, the relations of the parties were changed. By the arrangements of Mr. Latimer, the ship and captain were employed in a new and different way. As a store-ship, she became a storehouse. Phillips became a store-keeper, intrusted with the keeping of opium in store, and the delivery of it upon the owner's orders; and responsible for losses of it by larceny or other ordinary causes. With duties differing from those of the captain of a carrying vessel, his profit was lessened; for his tonnage, of course, ceased during this time. The storage went to the owner of the vessel. As the employment of the captain was a different one from that in which he was originally engaged, and the duties new, it is clear that he was entitled to some compensation; and in the absence of all contract between the parties, we must inquire what rule results in law from the nature and circumstances of the case.

This transaction having taken place in China, the local law, if there was any specifically applicable to the case, must, in the first instance, be looked to. If there was none, we must consider how the general principles of commercial law bear upon the facts of the occurrence. If there was a usage established and generally known among persons engaged in this trade, that becomes the rule to which the contract must be referred. And finally, the course of dealing between the parties, and the acts and admissions of themselves and their agents must have much weight in determining their respective rights. Let us look at these in their order.

No local statute having been brought to the notice of the court, we are referred to general principles of law and evidence, for the discovery of the intention of the parties, and the rights arising from them. What then is this kumshaw, this five dollars, paid on the delivery of a chest of opium to a purchaser or smuggler? and to whom does it belong? The owner of the ship is entitled to all the earnings of the ship. That which is claimed by and paid to the ship, in this trade, is the storage: this is paid for the use of the ship, and for the risk and expense of keeping the opium. But the kumshaw is for something else. The owner of the opium is entitled to all that enters into the price of the opium; but there seems to be no pretence that the kumshaw is a part of this price. The consignee of the ship or of her outward cargo has nothing to do with the kumshaw: he is entitled to nothing but commissions upon what he receives for storage and sales. It is plain, too, that this kumshaw is not a charge made for the mere delivery of the opium, and due therefore to the hands on board the ship; for nothing is paid when the opium is transferred to another ship, though the trouble is as great as must attend its delivery to a smuggler.

For whose benefit, then, is the kumshaw paid? When the captain of a ship becomes a warehouse-man, he acts as consignee and not as captain. As consignee he is entitled to some compensation. Was this kumshaw considered as his compensation? While the ship is engaged in its ordinary employment, the owner has a right to the time and services of the captain to the extent of the duties of that officer's station. But if duties are undertaken not within the ordinary scope of the captain's profession, but in a new, peculiar and unanticipated office, then the employer must pay a compensation; according to the value of the service, if usage has not fixed the rate of recompense; or according to established usage, if there be any. Where the compensation of any agent is settled by contract, or, without contract, is fixed by usage, the jury, in the first instance, are not to inquire what the service was worth on a computation of the value of the time and labour, but they are to inquire into the fact of the existence of the contract or usage; and if they find neither, then they are to al-

low what is reasonable. On this point, (of the reasonable compensation,) you will judge. In the general trade it is admitted that the whole kumshaw goes to the captain. In the opium trade the arrangement, in British ships, appears to have been to divide the kumshaw; while in the only case where a ship of the same nation as the one in question has been engaged in the opium trade, the captain received the whole. The Scattergood took the place of that ship. You will judge, from the whole evidence, whether it is reasonable that she should succeed to the same rule of disposition of the kumshaws.

A contract may be inferred from usage. The usage of merchants constitutes the law of merchants: it is a rule of their own making and binds when no other law is applicable. The influence of usage is universal. It attaches to nations and to individuals. It creates obligations. It interprets laws. In all governments, and in every community there are laws of usage and custom. Where a publick officer has compensation fixed by statute, though usage cannot alter the law, yet it is evidence of the construction given to the law, and is binding on past transactions. Publick officers may, by usage, be entitled to compensation for services beyond the line of their regular duty, and usage will regulate the amount of their compensation. General custom is a general law, and forms the law of contracts, and this, sometimes, though it be at variance with their terms. It controls even the principles of law. Thus the right to the way-going crop, days of grace and times of protest, are regulated by the usage of the place or bank, and affect even those who have no notice of the custom. The ancient, established, uniform and known custom of persons engaged in any trade makes a law for that trade, though it is not applicable to other trades. It is their way of doing business. It is the rule to which all who enter that trade, are understood to consent. It makes, supplies, and construes their contracts. We may here add, that known and settled usages ought to be respected by courts and juries, unless such usages are against the laws or policy of the country: otherwise our dealings with foreigners in foreign lands will fall into disorder and confusion. And I may observe, that less evidence would be required to establish an usage in trading among distant, Eastern nations, where persons live far removed from the laws and customs of their own and other Christian countries, and yet can scarcely be expected to be governed by those of the people, penitus orbe divisos, among whom they are.

What then will make an usage illegal? Not the amount which may be regulated by it; for that depends on accident. You will then decide whether, at the time the Scattergood was employed as an opium ship, there was a known, settled usage as to who was entitled to the opium kumshaw. A legal usage is a thing which it is not easy to establish. The single case of the Levant is not, by any means, enough to make an usage; (nor, if there had been an usage, would casual instances of a different agreement on the British ships destroy it:) but if you think that there was, essentially, no difference between the opium-kumshaw and the kumshaw in the general trade, then, as there appears to have been an ancient, uninterrupted and general custom to give these to the captain, such evidence of usage will be sufficient.

If no usage is found, or if it is found that the rights of the parties in this case were not left dependant upon usage, we must refer to the course of dealing between the parties; for their accounts, acts, letters and declarations are competent evidence of the nature and terms of the tacit, understood, implied contract, under which they acted, and upon which they settled their mutual claims. The letter of attorney under which Mr. Latimer acted, gave him a discretion without reserving to the plaintiff a power to review or reverse acts done within that discretionary authority. The rule of all agencies, publick and private, is, that if authority is given to the agent to do specifick acts, and he exercise that power according to the right conferred; or, if a general authority is given to him to act in the premises according to his discretion, and he do so act; the principal is bound as to the person with whom the agent deals, unless fraud is shewn. If a power be conferred upon an agent, and yet be attended by private instructions as to the exercise of it, or restrictions not known to those with whom the agent deals, the principal is bound to the extent of the power which appears to be conferred. If a power has been assumed without warrant, by one professing to act as agent, the principal may ratify or annul acts done under such power, when informed of them. But he must adopt or reject the whole act: He has no right, without the consent of the other party, to adopt part of an act and reject part. If the acts of an agent are partly within the authority given to him, and partly beyond it, they may be adopted by the principal so far as they are within the power, and disavowed as to the residue. But where a principal has a right to disavow an act done in his name, or on his account, he must do so within a reasonable time after he is made acquainted with it, and must give notice to the party to be affected: otherwise the law will presume an acquiescence; or the jury may infer it, according to circumstances. If the facts are ascertained, the law makes the presumption. If contested or doubtful, the subject is referred to a jury, under the court's direction.

These principles respecting agency apply to the present case. And if the account settled by Mr. Latimer was within the powers given to him, or has been acquiesced in by

the plaintiff, the principles already stated come into action.

A settled account is, in general, binding: and to be otherwise. there should be shewn either fraud or palpable mistake. And. let me say, that this. principle acquires new force when death has interposed to close a party's lips, and to deprive those who survive him of knowledge and means of defence. It is justly said, that there is a time for all things; which being suffered to pass, there should be an end of question.

The jury found for the defendants.