United Artists Corporation of Japan v. Commissioner.
UA Corp. v. Commissioner
Docket No. 272.
United States Tax Court
1944 Tax Ct. Memo LEXIS 204; 3 T.C.M. (CCH) 574; T.C.M. (RIA) 44210; June 13, 1944
*204 T. Newman Lawler, Esq., 152 W. 42nd St., New York, N. Y., for the petitioner. Ellyne E. Strickland, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves income taxes for the calendar years 1938 and 1939. Deficiencies were determined by the Commissioner in the amount of $2,443.44 for the calendar year 1938 and in the amount of $2,800 for the calendar year 1939. Part of the deficiency for each year, 1938 and 1939, is due to the disallowance by the Commissioner of an amount claimed by the petitioner as credit against its income tax liability on account of foreign income tax allegedly paid to a foreign country. Petitioner has not assigned this phase of the Commissioner's determination as error and has withdrawn any claim to this alleged credit. Effect will be given thereto in the decision to be entered under Rule 50. The only issue presented is whether income earned by the petitioner in Japan in 1938 and 1939 and received in Japanese yen, which were allegedly "blocked" by the Japanese Government, should be included in petitioner's gross income for Federal income tax purposes in United States dollars. From evidence adduced, *205 we make the following Findings of Fact United Artists Corporation of Japan (hereinafter sometimes referred to as petitioner) is a corporation duly organized and existing under the laws of the State of Delaware, with its principal office in New York City. Until December 7, 1941, petitioner was engaged in the business of distributing in Japan motion picture photoplays of independent producers. Petitioner obtained these photoplays from its parent corporation, United Artists Corporation (hereinafter sometimes referred to as United), which owns all of the stock of petitioner. The film rentals or license fees derived by petitioner from the licensing of photoplays for exhibition in Japan are divided 60 per cent to the producers and 40 per cent to petitioner. Of the 40 per cent retained by petitioner, 5 per cent is payable to United as commission. Petitioner, during 1938 and 1939, maintained its books and records on an accrual basis of accounting. Prior to July 1937, petitioner experienced no difficulty in exporting money from Japan. It was petitioner's custom to remit to New York all monies not required in the operation of its business in Tokyo and to pay the producers their share as *206 soon as the money was received in New York. In July 1937, the Japanese Government restricted to 1,000 yen a month the amount of Japanese yen which could be exported without a special permit, and in December 1937 the maximum was further reduced to 100 yen a month. The free importation of goods into Japan was also stopped during 1937 and it became impossible to import motion pictures into Japan without a special permit from the Japanese Government. Toward the end of 1938, the importation of new pictures was altogether prohibited. Violations of these regulations were punishable by fines and imprisonment. Japanese Exchange Control Authorities inspected the books and banking transactions almost monthly, and otherwise rigidly enforced the regulations so as to deter evasion. Applications for permission to export sums in excess of the maximum set forth above were formal documents which had to be made in quintuplicate in Japanese to the Minister of Finance. Petitioner could not barter and thus remove funds from Japan without a permit and it was impossible for a company doing business in Japan to sell American dollars against delivery in Japanese yen in Japan, except with a permit. Japanese *207 yen could be used in the purchase of Japanese securities, such as Government bonds, but they could not be taken out of the country without a permit. These permits were difficult to obtain and would not be given except in connection with the importation of goods deemed essential by Japan, such as scrap iron, gasoline and cotton. Furthermore, the State Department of the United States advised the Motion Pictures and Distributors' Association that it did not look with favor upon investment in Japanese bonds. Japanese yen could also be used by petitioner to pay its operating expenses. The investment of yen in Japan was permitted provided, however, that the business to be carried on was deemed to be essential by the Japanese Government. The petitioner had accumulated a very large deposit account in its American bank, but these deposits were payable by petitioner's bank in Japan and only in the form of yen. The petitioner and seven other American film companies were members of a trade association, known as American Motion Picture Association of Japan (hereinafter sometimes referred to as the Association). The Association's purpose was to deal with problems of the motion picture industry *208 as it affected its members and to deal with Japanese exhibitors and with the Japanese Government. After the restrictions of July 1937 were put into effect, the Association appointed a committee to discuss with the Minister of Finance a plan for the remittance of dollars and the importation of motion picture films. These negotiations culminated in an agreement in August 1938. The three principal terms of this agreement were as follows: (1) The eight motion picture companies who were members of the Association were to be allowed to import pictures up to December 31, 1938, of a total print value of $30,000 (minimum print value per foot was 1 1/2 cents); the importation of each picture was subject to the approval of the Department of Finance; (2) The eight companies were to be permitted to export to the United States from royalties obtained from the exhibition of the pictures a total of 3,000,000 yen on or before December 31, 1938; (3) The 3,000,000 yen which were permitted to be remitted were to be converted into dollars and deposited with the San Francisco Branch of the Yokohama Specie Bank, Limited (hereinafter sometimes referred to as Branch Bank), to be payable three years from *209 the date of deposit, without interest. The original agreement, written in Japanese, is in Japan; no official transiatlon was ever made of the original agreement. Any violation of the terms of this agreement would result in its cancellation. The print costs totaling $30,000 and the 3,000,000 yen were allocated among the eight companies in proportion to their imports over a period of years prior to the enforcement of the ordinance restricting the importation of films and the exportation of currency. Under this arrangement there were allocated to the petitioner approximately $3,000 to be used for payment of print costs for 1938 and 398,347.50 yen to be remitted from Japan. The petitioner was permitted to and did in fact remit yen to the Branch Bank in accordance with the following schedule: Deposited with Yo-
Payable by Yo-
kohama Specie Bank
kohama Specie Bank
Date
Amount
Rate
Amount
Date
in Yen
9/27/38
78,255.00
.27 11/16
$ 21,666.85
9/27/41
10/29/38
78,255.00
.27 3/4
21,715.76
10/28/41
10/29/38
85,327.50
.27 3/4
23,678.38
10/28/41
12/ 8/38
78,255.00
.27 1/4
21,324.48
12/ 7/41
2/ 3/39
78,255.00
.27 1/4
21,324.48
2/ 2/42
398,347.50
$109,709.95
*210 These, together with the $3,000 for prints were the only funds which petitioner was permitted to export during 1938 and 1939. It represented the best arrangement petitioner could make as a result of its efforts to secure permission to export funds to the United States. The Branch Bank issued to United receipts evidencing each of the deposits made of these funds. Each of these receipts was marked "non-negotiable" and stated that the amount credited would be paid without interest, three years from the date of deposit to United. Inquiries were made by United as to the possibility of discounting these non-negotiable receipts. Advice was indirectly received from Tokyo that no such action would be tolerated. The deposit made by petitioner on September 27, 1938, and the deposit of $21,715.16 made on October 29, 1938, were collected by United from the Branch Bank in 1941 and paid to various producers of United. This was in accordance with a resolution of the board of directors of United passed on April 4, 1939, to the effect that if United received the sums deposited to its credit in the Yokohama Bank the money so received should be prorated among the pictures imported into Japan prior *211 to September 1, 1938, in accordance with the credit balances of such pictures as of December 31, 1938. The American companies were told that if any of them did anything to evade or get around the Japanese financial regulations the money would be returned to Japan. On the first day of January 1938, 1939, and 1040, petitioner owed the producers 165,433.99 yen, 585,677.29 yen, and 1,024,193.84 yen, respectively; and on the first day of January 1938, 1939, and 1940, petitioner owed United 51,919.62 yen, 181,764.48 yen, and 122,107.64 yen. The value of Japanese yen during 1938 and 1939 ranged from a low of 22 United States cents to 28 United States cents. The sum of $23,678.38 deposited by petitioner on October 29, 1938, was in 1941 credited to petitioner's indebtedness to United on the latter's books for commissions, prints, advertising, accessories and other items. Petitioner had no creditors in the United States other than the producers and United. The deposits made by petitioner on December 8, 1938, and February 3, 1939, have never been paid by the Branch Bank for the reason that it was taken over by the Banking Department of the State of California on December 8, 1941, on which date *212 a state of war was declared to exist between the United States and Japan. United filed a verified proof of claim with the Superintendent of Banks of the Banking Department of the State of California covering the two unpaid letters of deposit, in which it recited inter alia that "claimant at all times since the issuance of said letters of deposit has been, and now is, the owner thereof and of the sums represented thereby." However, no payment has been made on the proof of claim. Petitioner's gross income and net income as reported by it for the calendar years 1938, 1939, and 1941, were as follows: Gross Income
Net Income
1938
$78,082.34
$17,988.86
1939
65,087.67
20,868.49
1941
114,043.63 yen
9,995.82 yen
A "rider." identical in all respects except for amounts was attached to petitioner's 1938 and 1939 return. It read as follows: "The taxpayer operates exclusively in Japan. Its taxable income would be * * * if converted from the yen at New York City newspaper rates of exchange. There were restrictions during all of 1938 upon the transfer of the yen, thereby preventing conversion of the above income to U.S. Dollars and receipt thereof, in the United States. *213 Under the decision of International Mortgage and Investment Corporation, 36 B.T.A. 187It was held that no income was received and, hence, no tax payable." Petitioner also attached the following rider to its 1941 return: "All amounts in this return are in blocked Japanese yen for which no real or effective rate of exchange existed in 1941 and, therefore, any rate of exchange used for the purpose of converting the yen into U.S. Dollars would be arbitrary and the results fictitious. "All data for 1941 are to September 27, 1941 as no accounting reports have been received for the months of October, November and December from our office in Japan due to the present world conditions. "During all of 1941 the funds of the company were under restrictions by the Government of Japan preventing their conversions into dollars and such restrictions have been in force since approximately July 1937. The only exception, however, being a special Exchange Agreement entered into in 1938 between the Government of Japan and the Motion Picture Distributors as a group permitting the Distributors to withdraw an aggregate amount of yen 3,000,000 payable in U.S. Dollars three *214 years later. The taxpayer's participation in this Agreement amounted to yen 398,347.50 or $109,709.95. "The entire amount of yen 3,000,000 was earmarked by Japan as payable to creditors of the Distributors and was ordered by that Government to be placed in escrow with the Yokohama Specie Bank payable in U.S. Dollars by that Bank's California Branch. "The taxpayer's participation was made payable to United Artists Corporation of Delaware, as follows: September 27, 1941
$ 21,666.85
October 28, 1941
45,394.14
December 7, 1941
21,324.48
February 2, 1942
21,324.48
$109,709.95
"The funds so deposited were in restricted and non-negotiable form and could not be sold, transferred or assigned. "The amounts due September 27, 1941, and October 28, 1941, were duly received and $43,382.61 was remitted to our Producer-Creditors and the balance of $23,678.38 was retained by United Artists Corporation of Delaware as a creditor of the taxpayer. The payments due December 7, 1941 (Sunday) and February 2, 1942, have not been made as the California branch of the bank was taken over by the California State Banking Authorities on December 8, 1941 when a state of war was declared to exist *215 between this country and Japan. "When the monies are released by the California State Banking Authorities, they will be remitted to Producer-Creditors. "In view of the fact that the monies released from freezing in 1941 were definitely ear-marked by the Japanese Government for the creditors of taxpayers and no part thereof could be retained by taxpayer for its own benefit, no taxable income was realized by it in 1941. "Taxpayer's position is based upon the decisions of the U.S. Board of Tax Appeals in International Mortgage & Investment Corporation, 36 B.T.A. 187, and Stuart, James & Cooke, Inc., B.T.A. Memo Opinion, February 28, 1938." Opinion The only question presented for determination in this proceeding is whether income earned by the petitioner in Japan in 1938 and 1939 and received in Japanese yen which were "blocked" by the Japanese Government, should be included in petitioner's gross income for Federal income tax purposes in United States dollars under section 22 (a) of the Revenue Act of 1938 and of the Internal Revenue Code. For the purpose of this decision, section 22 of the Internal Revenue Code is the same as section 22 of the *216 Revenue Act of 1938. The latter is set forth in the margin. [1]
Before examining the merits of this controversy, it appears necessary, and it will clarify the record, to advert to certain evidence. On trial the petitioner offered in evidence, over the objection of the respondent, Exhibits Nos. 1, 2, 4, and 5. No. 1 was admitted in evidence and ruling reserved on the admissibility of Nos. 2, 4 and 5. No. 1 purports to be a translation of Articles 1 and 4-(2) of Finance Department, Ordinance No. 1, 1937, of the Japanese Government, together with Article 3 of the Department of Finance Order of 1933. *217 The respondent urges, in substance, that there was not the proper proof of foreign written statute. It has generally been held in the United States that foreign written law should preferably be proved by copy. Jones on Evidence, Second Edition, page 3149; 4 Wigmore on Evidence, 1940 Ed., p. 549. The exhibit is not verified or exemplified by any official of the Japanese Government; "Nevertheless, there are several authoritative decisions that parol proof of foreign statutes is admissible." Jones on Evidence, Second Edition, p. 3149 - cited cases, among them Canale v. People, 52 N.E. 310; and The Pawashick, Fed. Cas. No. 10,851 in which cases parol proof was admitted of foreign law. After discussing the matter at length, Jones concludes, page 3151: * * * It would seem from all the foregoing that both expert testimony and properly authenticated copies are admissible in proof of foreign written law, and that if the one is aided by the other, the strongest proof is made which circumstances permit. Jones also says, page 2409: * * * The law of a foreign country or sister state may be proved not only by jurists and lawyers who have practiced their profession *218 in that jurisdiction, but also by those not lawyers who, from their official position or business relations have become acquainted with such laws. See also Slater v. Mexican National R.R. Co., 194 U.S. 120. The exhibit in question was shown to two witnesses, both men of much experience in Japan, in the matter of restrictions imposed by the Japanese Government upon the exportation of money. One of them, the Supervisor of the branches of the National City Bank of New York in Japan and Manchuria, residing in Tokyo during the period in question, and familiar with the Japanese restrictions on exportation of money, testified that the exhibit was "Extracts of the Ministry Department of Japan, ordinances that had to do with exchange control, translations of parts of those ordinances"; also, that "They appear to be correct. I don't remember them word for word but I see here it states the amount that could be done without a permit in the way of an exchange transaction reduced from 30,000 yen to 1,000 a month on July 7, 1937 and subsequently revised to 100 yen on December 7, 1937. I wouldn't be sure within a few weeks, but they are quite correct, I think." The *219 other witness had been during the period in question managing director of the Japanese subsidiary of Universal Pictures Co. in charge of the Far East territory and a part of that time was chairman of the American Motion Pictures Association of Japan. He was familiar with the restrictions placed by Japan upon the export of money. He testified, as to Exhibit No. 1: "If my recollection serves me, this is a fairly accurate translation of the regulations in force." Petitioner's counsel convincingly demonstrated that every reasonable effort had, without avail, been made to secure an official copy of the Japanese regulations, and that the exhibit had been transmitted from petitioner's manager in Japan. The point of importance here is the provision of the regulation limiting exportation of money. On this point we think the witnesses were competent to, and did, under the authorities above quoted, properly inform the Court of the state of the Japanese law represented by the exhibit, and that the point here at issue being so limited as it is, it should not be held material that they could not verify the entire instrument as a true copy in its every detail and word. Taking judicial notice of *220 the existence of a state of war between the United States and Japan, we are convinced that, under all of these circumstances, the best secondary evidence obtainable as to this exhibit was offered to the Court. The impossibility of this petitioner's procuring an authenticated copy of the pertinent Japanese laws and decrees, together with verified translation of the same, must be apparent. "The rule does not mean that men's rights are to be sacrificed and their property lost because they can not guard against events beyond their control; it only means that, so long as the higher or superior evidence is within your possession or may be reached by you, you shall give no inferior proof in relation to it." Thomas v. Thomas, 1 La. 166, 168, quoted in 4 Wigmore on Evidence, sec. 1192. We are of the opinion that under the circumstances in this case the evidence of men whose businesses required them to be acquainted with Japanese laws and regulations relating thereto may be relied upon without sacrificing improperly the safeguards which rules of evidence afford against the imposition of fraud upon the Court. Wilcocks v. Phillips, 1 Wall. Jr. 47, *221 Fed. Cas. No. 17639, involving evidence of the written law of China, wherein the Court, adverting to the "practical needs of man-kind," and to the fact that China (about 1843) was "isolated and peculiar," intimates the propriety in a proper case of admitting oral proof. Japan, at the time here pertinent, was at least as isolated and peculiar, as the China of 1843. Reason and justice require some relaxation of the best evidence rule on foreign written law, in time of war. The record contains no suggestion on the part of the Commissioner that in fact the oral exposition of petitioner's witnesses as to the state of the Japanese law was inaccurate and unreliable. In addition, it may be noted that oral evidence, containing in substance the same information contained in the exhibit, was placed in the record without objection. We properly admitted the exhibit and have found and set forth above the fact of the Japanese restriction upon exportation of money. Exhibits Nos. 2, 4 and 5 were, respectively: a letter to the representative of the American Motion Picture Association of Japan, stating the terms and conditions relative to importation of American motion pictures; a letter to United *222 Artists Corporation of New York, petitioner's parent corporation, from the Japanese manager of the petitioner, under date of August 17, 1938; and under date of August 13, 1938, a letter from such manager to the vice president of United Artists Corporation. These instruments are denied admission in evidence as not properly identified and as hearsay and no findings have been made based thereon. We are of the opinion that the decision in this case is governed by this Court's opinion in International Mortgage & Investment Corporation, 36 B.T.A. 187, wherein this Court held that the petitioner therein realized no gain for Federal income tax purposes as a result of the receipt by the petitioner of marks which could not be removed from Germany either physically or by way of credit during the taxable year, where the petitioner's agent in Germany received from mortgagors more marks than the mortgages had cost the petitioner. The following excerpt from this Court's opinion at page 190 of the International Mortgage & Investment Corporation case is, we believe, decisive of the issue in the instant case: * * * Measured in marks, the petitioner had income from *223 its business in Germany, but income for our Federal income tax purposes is measured only in terms of dollars. * * * [citations.] The excess of amount realized over cost of the mortgages during that period was not measurable in terms of dollars. None of the marks received by the petitioner's agents representing repayment of mortgage principal could be removed from Germany either physically or by way of credit during the remainder of the taxable year. The dollar equivalent of those marks could not be obtained. The petitioner did not have unrestricted use and enjoyment of the marks. It had a claim against its agents for the amount of the marks but it could not remove the credit or the marks from Germany. It could not use the marks to retire its bonds as it desired to do. Just at the end of the year there was a regulation passed which permitted reinvestment under certain circumstances. But proceeds of such reinvestment would likewise be blocked and the regulation in no way benefited the petitioner during 1931. The petitioner had no way of obtaining these funds during 1931. It tried to have the funds released, but was unable to have any of them released until a number of years later. Thus *224 it appears that these particular marks during 1931 were subject to a very serious restriction and were in no sense the equivalent of free marks. It was, therefore, improper to compute a gain to the petitioner from the repayment of the mortgages by translating the excess marks received into dollars at the rate of exchange applicable to free marks. The petitioner had no gain during 1931 from the receipt of the blocked marks. Respondent relies upon the case of Credit & Investment Corporation, 47 B.T.A. 673. We believe that case to be distinguishable on its facts from the instant case for the same reasons for which it was distinguished in the opinion from the International Mortgage & Investment Corporation case, supra. That reason is most succinctly set forth at page 681, wherein this Court states that: "The evidence, in our judgment, falls far short of conclusively showing, as petitioner must show, that the particular marks could not have been transferred out of Germany and sold." Again, at page 682, this Court stated that: "In the face of this evidence it can not be found that the restrictions imposed by the German Government made it impossible *225 for petitioner to have taken out the 360,771.89 [marks] if it had endeavored to do so. The authorities relied upon [International Mortgage & Investment Corporation, 36 B.T.A. 187] are therefore inapplicable." The evidence in the instant case establishes that petitioner was unable to export more than its 398,347.50 yen during the taxable years in question and that as to those yen which were exported, "The petitioner," as in the International Mortgage & Investment Corporation case, "did not have the unrestricted use and enjoyment * * *" thereof. During the taxable years the money in the Yokohama Specie Bank in San Francisco was in no appreciable way less blocked from petitioner's use than if it had been in Japan itself, and was subject to be returned to Japan, if the restrictions upon it were evaded. Respondent also relies upon the case of Phanor J. Eder, 47 B.T.A. 235; reversed on other grounds, 138 Fed. (2d) 27. In that case, the taxpayer urged the applicability of the International Mortgage & Investment Corporation case, but this Court held that that case was not in point as it was *226 not premised upon any specific legislation as was the deficiency in the Eder case, to wit, section 337 (b) of the Revenue Act of 1938. As this Court pointed out in the Eder case at page 240 of its opinion, Congress, in enacting section 337 of the Revenue Act of 1938 and Supplement P in which that section is included, did not make the legal transfer to the United States of the distributed earnings of a foreign personal holding company a condition precedent to the levying of the tax. Distribution was assumed by the statute and this Court went on to state that "Assumed distribution even when actual distribution was legally impossible, has been held to properly support other income taxes." We have no such statute or assumed distribution in this case, and the principle does not here apply. We hold that the income received by the petitioner in Japan in 1938 and 1939 in Japanese yen is not to be included in petitioner's gross income for those taxable years. We do not have before us any question as to the taxability of the $67,060.99 which was paid by the Branch Bank in 1941 to United in satisfaction of the obligations of the petitioner herein. Decision will be entered under *227 Rule 50. Footnotes
1. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities. or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *↩